**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**Northern Division**

| | |
|---|---|
| **DONNA BUETTNER-HARTSOE** | |
| 4804 WATERPARK DRIVE | |
| BELCAMP, MD 21017 | |
| [Harford County, MD] | |
| | |
| and | |
| | |
| **N.H., a Minor,** by and through her Parent | **Case No. _____** |
| and Next Friend | |
| **DONNA BUETTNER-HARTSOE** | **JURY TRIAL DEMANDED** |
| 4804 WATERPARK DRIVE | |
| BELCAMP, MD 21017 | |
| [Harford County, MD] | |
| | |
| *Plaintiffs* | |
| | |
| v. | |
| | |
| **BALTIMORE LUTHERAN HIGH** | |
| **SCHOOL ASSOCIATION, D/B/A** | |
| **CONCORDIA PREPARATORY SCHOOL** | |
| 1145 CONCORDIA DRIVE | |
| TOWSON, MD 21286 | |
| [Baltimore County, MD] | |
| | |
| <u>SERVE ON RESIDENT AGENT:</u> | |
| | |
| BRENT JOHNSON | |
| 521 IDLEWILD ROAD | |
| BEL AIR, MD 21014 | |
| | |
| *Defendant.* | |

<u>**COMPLAINT AND JURY DEMAND**</u>

 **NOW COME** the Plaintiffs, N.H., by and through her parent and next friend Donna

Buettner-Hartsoe, by and through their attorneys, Ketterer, Browne & Anderson, LLC, and bring

1

forth this Complaint against the Defendant, Baltimore Lutheran High School Association d/b/a Concordia Preparatory School, and in support sets forth the following:

## PARTIES, JURISDICTION, AND VENUE

1.      At all times relevant to this action, Plaintiff N.H. is a minor resident of Harford County, Maryland (hereinafter referred to as "N.H.").

2.      At all times relevant to this action, Plaintiff Donna Buettner-Hartsoe is an adult resident of Harford County, Maryland, and is the mother of the minor Plaintiff N.H.

3.      Plaintiffs N.H. and Donna Buettner-Hartsoe will be referred to collectively as "Plaintiffs".

4.      At all times relevant to this action, Defendant Baltimore Lutheran High School Association d/b/a Concordia Preparatory School (hereinafter referred to as "Defendant" or "CPS") is a corporation organized and existing under the laws of the State of Maryland that maintains its principal place of business at 1145 Concordia Drive, Towson, Maryland.

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because Plaintiffs' statutory claim asserts a federal question over which this Court has jurisdiction and Plaintiffs asserts state-law claims over which this Court has supplemental jurisdiction.

6.      This Court has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(1)(a) because Defendant is domiciled in and conducts business within this judicial district.

7.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because all the acts and omissions alleged herein occurred in this judicial district.

8.      The Northern District is the proper venue per 28 U.S.C. § 100(1).

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

9.    N.H. enrolled at CPS in the fall of 2017, when she was just fourteen old.

10.    CPS is an elite, co-educational parochial secondary school serving grades 6-12.

11.    CPS holds itself out as a "compassionate, Christ-centered community of servant leaders" that "strive[s] to create an environment that nurtures our students' spiritual, academic, physical, and social growth to become men and women of faith and service."

12.    It invites those looking to be "active participants in a safe and nurturing environment."

13.    Originally known as Baltimore Lutheran School, CPS is operated by the Baltimore Lutheran High School Association, Inc., (hereafter, "Defendant") an organization of Lutheran churches in the Baltimore area.

14.    According to CPS's website, the estimated annual cost of attendance for a high school enrollee is over $15,000.

15.    Prior to enrolling at CPS, N.H. thrived in middle school, where she excelled in sports and enjoyed numerous close friendships.

16.    N.H. grew up in a closely-knit family and had strong relationships with her parents, her twin sister, and her older siblings.

17.    Although N.H. had a variety of options for her high school education, she and her family chose CPS due to CPS representatives' promises of a safe, tight-knit community.

18.    CPS representatives told N.H. and her parents that the school offered a caring, closely-knit community in which she would have teachers and administrators looking out for her safety and well-being.

19.     N.H. and her parents believed she would be safe and would thrive at CPS as she had in middle school.

20.     N.H.'s parents paid the full tuition and fees for attendance at CPS and did not receive financial aid from CPS.

## CPS'S HYPER-SEXUALIZED CULTURE

21.     N.H. found CPS to be far from the safe, nurturing community that she was promised.

22.     From the time she arrived on campus, N.H. experienced unwelcome sexual advances from some male students who were emboldened by formal and informal "traditions" at the school.

23.     Unbeknownst to N.H., older boys started to sexually target her the moment she set foot on campus.

24.     The concept of CPS students engaging in sexual behavior on CPS property, often during the school day, has long been part of CPS's ethos.

25.     One of the frequent venues for sexual behavior on CPS's campus is the visiting sports team's locker room (hereinafter the "Locker Room"), which is largely unused during the school day.

26.     The culture of using the Locker Room as a venue for engaging in sexual behavior during the school day was a prevalent part of CPS's culture while N.H. was a student, and was well known to the faculty and administrators.

27.     This hyper-sexualized culture at CPS was fueled in large part by a general consensus that student-athletes – especially male student-athletes, whose athletic programs drew in large alumni donations – were "above the law" and free from recrimination for rule-breaking.

## CPS'S FAILURE TO PREVENT AND STOP SEXUAL HARASSMENT AND ASSAULT ON ITS CAMPUS

28.     CPS failed to investigate, report, or take any meaningful action to curb instances of sexual harassment and assault on its campus prior to N.H.'s enrollment.

29.     Upon information and belief, a CPS teacher's daughter was assaulted while she was a student at CPS, and CPS' failure to act in response to the assault caused the teacher to un-enroll her daughter and to cease working for the institution.

30.     Upon information and belief, other former CPS students, who are still minors, were the victims of sexual assault during their tenure at CPS for which no investigation took place.

31.     This failure is not surprising given CPS' pattern of ignoring sexual assault and harassment.

32.     CPS was, or should have been, aware that many of its male students (some of them over the age of 18) had escalated the Locker Room tradition by using that space as a venue for forced sexual encounters with female students.

33.     CPS knew or should have known that students used the Locker Room as a venue for sexual harassment and/or statutory rape and secured CPS facilities that students used as "hook-up" spots or venues for sexual behavior.

34.     CPS took no significant action to investigate this allegation or any other instances of alleged aggressive sexual behavior by its male students.

35.     Similarly, CPS failed to investigate the usage of the Locker Room as a venue for sexual encounters, despite CPS' use of key cards and electronic tracking that would have made it possible for CPS to determine which male students were luring female students into the Locker Room for sexual encounters.

36.     Had CPS conducted the careful investigation that was plainly warranted and taken appropriate action, these known instances of sexual assault could have been easily prevented.

37.     CPS' failure to act resulted in, among other harms, N.H.'s sexual assault in April 2018 as described herein.

### N.H. IS REPEATEDLY ASSAULTED ON CPS' CAMPUS

38.     In or around January 2018, N.H. began a friendship with a classmate, "John".

39.     John engaged in a series of non-consensual sexual acts with N.H., including filming a FaceTime call with N.H. in which N.H. masturbated (hereinafter, the "Video").

40.     N.H. did not consent to being filmed without her knowledge, nor did she consent to the dissemination of the Video.

41.     Unbeknownst to N.H., the Video was circulated around CPS via the iPhone "Air Drop" method of sharing and downloading files.

42.     Within weeks, the Video had circulated amongst the student body to the point that administrators and teachers were aware of its existence.

43.     In fact, N.H.'s guidance counselor, Ms. Gill, called a meeting with N.H. in which she discussed "rumors" about N.H. that she had heard. Ms. Gill did not inform N.H.'s parents about the Video.

44.     Meanwhile, the existence of the Video caused several male CPS students to fixate on N.H. as the object of their sexual obsessions.

45.     N.H. began receiving threatening phone calls from two such male CPS students, demanding that she perform oral sex and engage in other sexual acts with them or else they would post the Video to various social media accounts, including SnapChat and Instagram.

46.     The student callers also threatened to release additional photos and videos of N.H. performing sexual acts; because N.H. was not aware that that the Video was being taken of her in the first place, she lived in fear that others of her private sexual encounters were clandestinely filmed and disseminated.

47.     During one such phone call, N.H.'s twin sister was present and heard these threats being made.

48.     Another male student, "C", began to harass N.H. on CPS grounds during the school day.

49.     C was a prominent student-athlete at CPS and had previously been recruited to play on the basketball team.

50.     In or around February 2018, C stuck his hand up N.H.'s skirt during a religion class. N.H. immediately told C to stop and left the classroom to inform the assistant principal, Mr. Miller. No action was taken on the part of Mr. Miller.

51.     N.H. also informed Ms. Gill of the assault; Ms. Gill informed N.H. that she had, in fact, told Mr. Miller about the Video. Still, no action was taken and N.H.'s parents were not informed.

52.     C continued his practice of verbally and physically harassing N.H. on CPS grounds.

53.     On or around April 13, 2018, N.H. was lured to the Locker Room after her track practice by a senior CPS student who wanted to "make out" with N.H. (hereinafter, the "Locker Room Assault"). The senior CPS student pressured her to perform oral sex on him. He then instructed N.H. to remain in the locker room and to walk further back in the room. In the back of the locker room, a group of male CPS students were waiting for her and pushed her to the back

of the room and turned out the lights. A student bear hugged N.H. and dragged her to the back wall while others students barricaded the door. C groped N.H. from behind and attempted to digitally rape her, while rubbing her hand against his erect penis. N.H. repeatedly told the students to stop and attempted to claw her way out of C's grip.

54.     Another CPS student who was in the Locker Room at the time intervened and helped N.H. escape the assault.

55.     Once outside the Locker Room, the male student and N.H. came face to face with N.H.'s twin sister, who saw the look of shock and anguish on N.H.'s face.

56.     N.H. and her sister reported the incident to CPS administrators on the next school day, but once more, the school failed to take any action and did not call N.H.'s parents.

57.     A female CPS student reported the blackmailing suffered by N.H. to Ms. Gill. CPS later expelled that student for having drugs on campus, not for his sexual misconduct with regard to N.H..

58.     The expelled student called N.H. weeks after the Locker Room Assault and demanded that she lie and tell his aunt that he did not disseminate the Video so that he would avoid punishment at home, which N.H. refused to do.

59.     Shortly after the Locker Room Assault, N.H.'s mental health and academic performance began to noticeably suffer.

60.     In or around April 2018, C approached N.H. while she was seated in the library and began screaming at her, calling her a "stupid bitch" for sitting in his chair, and threw her personal items on the ground. N.H. and her sister (who was also in the library) reported the incident to the principal, but again, C evaded punishment. N.H. was told to return to the library.

61.     Both male and female CPS students, including middle school students who saw the Video, began to bully and ridicule N.H..

62.     Male students told N.H. that they routinely masturbated to her images.

63.     N.H. was forced to change her phone number to evade constant harassment via social media and text messages.

64.     N.H. began seeing a counselor for PTSD symptoms and depression.

65.     N.H. informed Ms. Gill that she was experiencing symptoms of depression.

66.     Among other things, N.H. began to engage in self-harming behavior and promiscuity, which is attributed clinically to her experiences of having been sexually assaulted.

67.     N.H. disclosed her sexual assaults and harassment to CPS administrators who failed to report the sexual assault to state or local authorities, failed to alert N.H.'s parents, failed to conduct any investigation, failed to do anything to stop the ongoing sexual assaults and harassment, and failed to offer N.H. *any* accommodations based on the sexual harassment and assaults she had reported.

68.     Despite CPS' action in expelling one of the assailants, albeit for reasons unrelated to the Locker Room Assault, administrators at CPS failed to make any report to state or local authorities, failed to conduct any investigation, failed to even inform N.H.'s parents, and failed to offer N.H. any accommodations for the sexual assaults and harassment that she had experienced on CPS' campus.

69.     Upon information and belief, these issues continue to pervade the CPS campus.

## N.H. IS TREATED LIKE A PROBLEM, NOT A SURVIVOR

70.     Shortly after administrators at CPS became aware that N.H. was sexually assaulted, they began to treat her like a problem on their campus.

71.     In one of her initial "counseling sessions" with Ms. Gill, N.H. recalls that Ms. Gill reacted negatively to N.H.'s use of the phrase "sexual assault" and told her "you shouldn't call it that." N.H. got the distinct impression that Ms. Gill thought that she was lying or that the encounter was consensual. N.H. felt abandoned by Ms. Gill in processing her trauma.

72.     Aside from baselessly insinuating that N.H. was not the survivor of assault, Ms. Gill did not investigate the allegations, and failed to report the allegations to authorities or to N.H.'s parents.

73.     N.H.'s health and academic performance continued to suffer throughout the spring semester of that academic year.

74.     Although administrators at CPS communicated their concerns about N.H.'s academic performance to her parents during routine parent/teacher conferences, they made *no* mention of the assaults against N.H..

75.     Overwhelmed by trauma and CPS' failure to do anything about it, N.H. began to engage in increasingly self-harming behavior.

76.     Based on her experience at CPS, N.H.'s parents decided not to enroll N.H. in the school for the following year, which resulted in N.H. having to adjust to a new environment while still processing the sexual assault that occurred months earlier.

77.     Due to the severity of her emotional distress stemming from her encounters of sexual assault at CPS, the sexually hostile environment at CPS, and the treatment she received from administrators at CPS, N.H. was forced to undergo extensive mental health treatment.

78.     Despite enrolling at a different educational institution after CPS, the students at N.H.'s new school learned through social media and rumors that N.H. had been involved in a sexual encounter at CPS. Without knowing that N.H. was assaulted, her new classmates

conferred on N.H. an unfair and hurtful reputation that she was unable to move beyond during the new school year.

79.     Thereafter, N.H. and her family elected to finish her high school education at home, far below the expectation of someone with her talent and intelligence.

## CAUSES OF ACTION

### COUNT I – *Violation of 20 U.S.C. § 1681, et. seq.*
### *Title IX of the Education Amendments Act*

80.     Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

81.     During the relevant timeframe, Defendant was a recipient of federal education funding within the meaning of Title IX, 20 U.S.C. § 1681(a).

82.     Defendant exercised substantial control over both students who assaulted N.H. and over the boys who harassed her. All the events giving rise to this claim occurred on CPS' grounds.

83.     In or about April 2018, N.H. faced severe discrimination based on sex when she was sexually assaulted verbally, physically and digitally on school grounds by CPS students, some of whom were over the age of 18. N.H. was also the victim of attempted statutory rape and of a pattern of unrelenting sexual harassment. The sexual assaults and harassment N.H. endured were sufficiently severe, pervasive, and objectively offensive to constitute a hostile educational environment for her at CPS.

84.     Defendant was on actual notice of the sexual assaults committed on N.H. and the hypersexual hostile environment that existed at the school during N.H.'s time there.

85.     Despite being on actual notice of the assaults on and harassment of N.H., CPS failed to take meaningful action to investigate the assault and/or to protect N.H. from retaliation

on the part of faculty, staff, and fellow students regarding N.H.'s attempts to seek out a safe educational environment.

86.     Defendant acted with deliberate indifference to the complaints and other notice regarding the ongoing hostile education environment, ongoing threats, bullying, and retaliation faced by N.H. after reporting that she was sexually assaulted.

87.     The hostile educational environment at CPS effectively barred N.H.'s access to educational opportunities and benefits because she was forced to leave CPS due to the continuing hostile environment at the school and due to ongoing bullying and retaliation at the school.

88.     In addition to the foregoing violations of Title IX, CPS violated its Title IX obligations by:

a.   Failing to have a Title IX coordinator or any other person to receive complaints about gender-based discrimination, harassments, and/or assaults;

b.   Failing to have any policy for a student's reporting of sexual harassment and/or sexual assault;

c.   Failing to have a program for prevention of sexual harassment and sexual assault;

d.   Failing to have a program or policy for investigating sexual harassment or sexual assault;

e.   Failing to have a program or policy for offering accommodations to victims of sexual assault;

f.   Failing to have a program or policy for preventing retaliation against those who report sexual harassment and/or sexual assault;

g.   Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

      h.   Retaliating against N.H. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

89.    As a direct and proximate cause of Defendant's violation of Title IX, N.H. has been deprived of educational opportunities and benefits that delayed her academic attainment during her high school education and thereafter. This deprivation was the result of Defendant's deliberate indifference to the hostile educational environment at CPS.

90.    As a direct and proximate cause of Defendant's violation of Title IX, N.H. has experienced and will likely continue to experience severe emotional distress accompanied by objective physical manifestations and/or symptoms (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep), loss of functioning, loss of earning potential, medical bills, and other pecuniary harms to be established at trial.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

### COUNT II – *Negligent Supervision and Retention*

91.    Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

92.    Defendant had a fiduciary relationship with N.H. as both a student and minor under the age of 18.

93.    As a Maryland educational institution, CPS owed N.H. a special duty of trust and confidence to ensure her safety and well-being.

94.     Defendant, through its Board of Directors, administrators, faculty, or staff, breached their duty owed to N.H. by, among other things:

    a.   Failing to properly protect N.H., a minor, from sexual abuse and harassment;

    b.   Improperly protecting N.H., a minor, from sexual abuse and harassment;

    c.   Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

    d.   Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

    e.   Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

    f.   Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

    g.   Failing to promptly report N.H.'s sexual assaults to the authorities;

    h.   Failing to take any action to prevent retaliation against N.H. after her assaults were reported to CPS;

    i.   Failing to conduct an exit interview with N.H. when she left the school;

    j.   Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

    k.   Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

l.  Retaliating against N.H. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

95.   Defendant, through its Board of Directors, administrators, faculty, or staff, knew or should have known that it had created an opportunity for N.H. to be sexually assaulted and harassed and that the lack of protocols for which incidents of sexual assault were reported were woefully insufficient.

96.   Defendant failed to provide adequate training, monitoring, and supervision of its administrators, faculty, and/or staff concerning reports of sexual assault.

97.   Defendant carelessly and recklessly failed to supervise its male students, even after specific complaints of **sexual** assault and harassment had been lodged against them by various students, including N.H..

98.   Defendant failed to implement training and monitoring mechanisms by which sexual assaults such as those suffered by N.H. could have been prevented, or at the very least, appropriately reported to parents and law enforcement authorities.

99.   Defendant's conduct was wanton, malicious, or oppressive in that Defendant disregarded or exhibited reckless indifference to the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

100.   As a direct and proximate cause of Defendant's violation of its fiduciary duty to her, N.H. has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

101.    As a direct and proximate result of Defendant's negligence, Plaintiff N.H. sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

## COUNT III – *Negligence*

102.    Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

103.    In the fall of 2017, N.H. enrolled at CPS and was thereby deprived of the protection of her parents while on school grounds and during the school day.

104.    Upon N.H.'s enrollment, Defendant assumed custody of her and other students while on the school's premises.

105.    In so doing, Defendant entered into a relationship with N.H. that imposed on it a duty of reasonable care, including, among other things, a duty of supervision to protect N.H. from reasonably foreseeable harm.

106.    Defendant, through its Board of Directors, administrators, faculty, or staff, breached their duty owed to N.H. by, among other things:

    a.    Failing to properly protect N.H., a minor, from sexual abuse and harassment;

    b.    Failing to identify and eliminate, minimize, and/or address known and foreseeable risks of physical and emotional injury;

16

c.   Improperly protecting N.H., a minor, from sexual abuse and harassment;

d.   Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

e.   Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

f.   Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

g.   Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

h.   Failing to promptly report N.H.'s sexual assaults to the authorities;

i.   Failing to take any action to prevent retaliation against N.H. after her assaults were reported to CPS;

j.   Failing to conduct an exit interview with N.H. when she left the school;

k.   Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

l.   Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

m.   Retaliating against N.H. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

107.    Defendant, through its Board of Directors, administrators, faculty, or staff, knew or should have known that it had created an opportunity for N.H. to be sexually assaulted and harassed.

108.    Defendant's conduct was wanton, malicious, or oppressive in that Defendant disregarded or exhibited reckless indifference to the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

109.    As a direct and proximate cause of Defendant's violation of its fiduciary duty to her, N.H. has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

110.    As a direct and proximate result of Defendant's negligence, Plaintiff N.H. sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

<u>COUNT IV – *Premises Liability*</u>

111.    Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

112.    While on CPS' premises, N.H. was a business invitee of CPS.

113.    CPS owed N.H. a duty to use reasonable care under all circumstances in the

maintenance and operation of the premises, and to take reasonable precautions to protect her against foreseeable dangers arising out of the arrangements or use of the premises.

114.    CPS, through its Board of Directors, administrators, faculty, or staff, failed to act with reasonable care to protect N.H. and her fellow female students from foreseeable dangers of which CPS had ample actual notice, including, among other things:

     a.  Failing to properly protect N.H., a minor, from sexual abuse and harassment;

     b.  Improperly protecting N.H., a minor, from sexual abuse and harassment;

     c.  Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

     d.  Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

     e.  Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

     f.  Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

     g.  Failing to promptly report N.H.'s sexual assaults to the authorities;

     h.  Failing to take any action to prevent retaliation against N.H. after her assaults were reported to CPS;

     i.  Failing to conduct an exit interview with N.H. when she left the school;

j.  Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

k.  Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

l.  Retaliating against N.H. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

115.  Defendant, through its Board of Directors, administrators, faculty, or staff, knew or should have known that it had created an opportunity for N.H. to be sexually assaulted and harassed.

116.  Defendant's conduct was wanton, malicious, or oppressive in that Defendant disregarded or exhibited reckless indifference to the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

117.  As a direct and proximate cause of Defendant's violation of its fiduciary duty to her, N.H. has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

118.  As a direct and proximate result of Defendant's negligence, Plaintiff N.H. sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including

attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

### COUNT V – *Intentional Infliction of Emotional Distress*

119.   Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

120.   While on CPS' premises, N.H. was a business invitee of CPS.

121.   CPS owed N.H. a duty to use reasonable care under all circumstances in the maintenance and operation of the premises, and to take reasonable precautions to protect her against foreseeable dangers arising out of the arrangements or use of the premises.

122.   CPS, through its Board of Directors, administrators, faculty, or staff, failed to act with reasonable care to protect N.H. and her fellow female students from foreseeable dangers of which CPS had ample actual notice, including, among other things:

a.   Failing to properly protect N.H., a minor, from sexual abuse and harassment;

b.   Improperly protecting N.H., a minor, from sexual abuse and harassment;

c.   Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

d.   Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

e.   Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

f.  Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

g.  Failing to promptly report N.H.'s sexual assaults to the authorities;

h.  Failing to take any action to prevent retaliation against N.H. after her assaults were reported to CPS;

i.  Failing to conduct an exit interview with N.H. when she left the school;

j.  Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

k.  Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

l.  Retaliating against N.H. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

123.    Defendant, through its Board of Directors, administrators, faculty, or staff, knew or should have known that it had created an opportunity for N.H. to be sexually assaulted and harassed.

124.    Defendant's conduct was extreme and outrageous, and it intentionally or recklessly caused N.H. severe emotional distress.

125.    Defendant's conduct was so outrageous in character, and so extreme in degree, that it exceeds all possible bounds of decency, is atrocious, and is utterly intolerable in a civilized community.

126.     Defendant purposefully intended to cause or recklessly disregarded the high probability of causing a disturbance of N.H.'s emotional tranquility that was so severe that harmful physical consequences resulted.

127.     As a direct and proximate cause of Defendant's violation of its fiduciary duty to her, N.H. has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

128.     As a direct and proximate result of Defendant's negligence, Plaintiff N.H. sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

## COUNT VI – *Negligent Infliction of Emotional Distress*

129.     Plaintiffs incorporate and reallege all paragraphs of this Complaint into this Count.

130.     Defendant had a duty to N.H. to refrain from engaging in the above-described conduct that it knew, or should have known, would foreseeably cause emotional distress to her.

131.     To the extent Defendant's conduct is not found to be reckless and/or intentional, the conduct is—at the very least—negligent.

132.     Defendant's negligent acts include, but are not limited to:

a.  Failing to properly protect N.H., a minor, from sexual abuse and harassment;

b.  Improperly protecting N.H., a minor, from sexual abuse and harassment;

c.  Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

d.  Failing to investigate, correct, and/or otherwise address the Locker Room tradition that emerged from this environment;

e.  Failing to investigate, prohibit, and/or otherwise address the formation of the illicit use of CPS facilities for sexual exploits and use of CPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

f.  Ignoring and/or otherwise failing to properly address complaints about numerous instances of sexual assaults occurring on the CPS campus;

g.  Failing to promptly report N.H.'s sexual assaults to the authorities;

h.  Failing to take any action to prevent retaliation against N.H. after her assaults were reported to CPS;

i.  Failing to conduct an exit interview with N.H. when she left the school;

j.  Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies;

k.  Failing to supervise, monitor, and/or train staff to handle reports of sexual assault appropriately and adequately; and,

l.   Retaliating against N.H. for reporting that she was sexually assaulted by subjecting her to arbitrary, capricious, and unwarranted "discipline" for pretextual reasons that masked the discriminatory nature of the school's treatment of her.

133.   As a direct and proximate cause of Defendant's malfeasance and nonfeasance, N.H. has experienced and will likely continue to experience severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep) and other harms to be established at trial.

134.   As a direct and proximate result of Defendant's negligence, Plaintiff N.H. sustained serious injuries, had to undergo treatment and medical care, to incur medical expenses, incur lost wages, to lose time from her daily pursuits, to lose the ability to function normally, and she suffered impairment of her future earnings.

**WHEREFORE** Plaintiffs demand compensatory damages to be proven at trial in excess of the jurisdictional amount of $75,000; all costs and expenses of this lawsuit, including attorneys' fees; enhanced compensatory damages as permitted by law; punitive damages in an amount to be determined at trial; and all other and further relief that justice may require.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues in this action so triable.


Dated: October 28, 2020                    Respectfully submitted,

                                            /s/ Justin Browne
                                           Justin Browne (Bar No. 29164)
                                           Christina Graziano (*pro hac vice* to be filed)
                                           KETTERER, BROWNE & ANDERSON, LLC
                                           336 S Main Street
                                           Suite 2A-C
                                           Bel Air, MD 21014
                                           Phone: (855) 522-5297

Fax: (855) 334-5626
Justin@KBAAttorneys.com
Christina@KBAAttorneys.com