**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| DONNA BUETTNER-HARTSOE, *et al.*, | | |
| | * | |
| Plaintiffs, | | |
| | * | |
| v. | | Civil Action No. RDB-20-3132 |
| | * | |
| BALTIMORE LUTHERAN | | Hon. Richard D. Bennett |
| HIGH SCHOOL ASSOCIATION | * | |
| d/b/a/ CONCORDIA | | |
| PREPARATORY SCHOOL, | * | |
| | | |
| Defendant. | * | |

   *    *    *    *    *    *    *    *    *    *    *    *    *

**BRIEF OF *AMICI CURIAE* IN SUPPORT OF DEFENDANT'S MOTIONS FOR**
**RECONSIDERATION OR, IN THE ALTERNATIVE,**
**TO CERTIFY ORDER FOR INTERLOCUTORY APPEAL**

*Amici Curiae* the National Association of Independent Schools ("NAIS"), the National

Business Officers Association ("NBOA"), the Association of Independent Schools of Greater

Washington ("AISGW"), the Southern Association of Independent Schools ("SAIS"), the Virginia

Association of Independent Schools ("VAIS"), the North Carolina Association of Independent

Schools ("NCAIS"), and the Palmetto Association of Independent Schools ("PAIS"), through

undersigned counsel and pursuant to Local Rule 105.12 of this Court (D. Md. 2021), respectfully

submit this Brief in Support of Defendant's Motions for Reconsideration or, in the alternative, to

Certify Order for Interlocutory Appeal (the "Motions").[1]

## INTRODUCTION

*Amici Curiae* submit this brief because extending the reach of Title IX (and other statutes)

to tax-exempt independent schools, and other nonprofit organizations that do not receive federal

---

[1] The Defendant has filed largely identical motions in each of the consolidated cases RDB-20-3132; RDB-20-3214; RDB-20-3229; RDB-20-3267; and RDB-21-0691.  This Brief is being submitted in support of the relief requested by Defendant in each of those consolidated matters.

funds, could impose massive, prescriptive compliance regimes that would overwhelm those entities, both financially and administratively.  We request that the Court consider the broader regulatory context, crucial aspects of which have not yet been covered by the parties' briefing, and the implications of its ruling and grant the Defendant's Motions.

Independent schools have long played a crucial role in the diverse educational landscape that serves our country's children from preschool through high school. Beyond providing students quality schooling and ensuring the health and safety of those students and other community members, schools must also keep tuition affordable (including often providing financial assistance to those families in need) and provide competitive and fair salaries to teachers and staff. The issue currently before this Court—whether the tax exemption that nearly every independent school receives constitutes "Federal financial assistance" that subjects the school to Title IX and, potentially, a myriad of other statutes and regulations—threatens to upset that balance.

For many years, independent schools throughout the country have relied on federal regulations and a consensus among education lawyers and other professionals that, by foregoing federal funds, they would not be burdened with the requirements of Title IX and a host of other federal statutes that mandate strict and cumbersome regulatory infrastructures.  The Department of Education's Title IX regulations include, among many other things, a specific and elaborate grievance procedure that mandates the hiring of a Title IX coordinator (and other staff trained to investigate and adjudicate sexual harassment and other misconduct allegations and apply complicated legal concepts), which could be extended to independent schools if they are brought under Title IX.  Independent schools have protected their students and staff through different, but rigorous and effective, safeguards tailored to their size and mission.

*Amici Curiae*, seven associations of independent schools, submit this brief in support of the motions of the Concordia Preparatory School (ECF No. 132, in the above-captioned case).

Fifty-four (54) other nonprofit organizations have signed a letter in support of this brief, attached hereto to as <u>Exhibit 1</u>. *Amici Curiae* and those signatories represent the vast majority of the private school community, which includes approximately 30,500 private schools serving 4.6 million students.  Together, we respectfully request that the Court reconsider its decision in light of the broader legal context laid out below, and the far reaching and unintended consequences the Court's decision could have.  In the alternative, we ask that the Court permit Defendant to immediately appeal this issue to the United States Court of Appeals for the Fourth Circuit. Granting an appeal will ensure that the Fourth Circuit provides clarity on this important issue (and quickly) and may help to avoid or shorten what is certain to be a period of disruptive uncertainty around the law in the nonprofit community.

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici Curiae*, the NAIS, NBOA, AISGW, SAIS, VAIS, NCAIS and PAIS, are each nonprofit membership associations dedicated to supporting the important missions of independent schools.[2]  They represent approximately 2,500 independent, private schools serving preschool through high school students. These schools educate over 750,000 students and employ more than 60,000 teachers nationwide. Independent schools are nonprofit organizations, tax-exempt under Section 501(c)(3) of the Internal Revenue Code, and are each guided by their own missions, overseen by independent boards of trustees, and are primarily financed through tuition and charitable contributions.

---

[2] More information about each of these organizations can be found at:
https://www.nais.org/about/
https://www.nboa.org/
https://www.aisgw.org/
https://sais.org/
https://www.vais.org/
https://www.ncais.org/
https://palmettoschools.org/

## ARGUMENT

I. **Independent Schools Have Relied on Longstanding Authority that Tax Exemption is Not "Federal Financial Assistance"**

   A. **Title IX Regulations Do Not Include Tax Exemptions in Their Definitions of "Federal Financial Assistance"**

Regulations implementing Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681–1683 ("Title IX"), do not include tax exemptions in the definition of "Federal financial assistance."  That fact alone controls any analysis of whether an institution's tax-exempt status brings it within Title IX's jurisdiction.  Independent schools have long relied on this authority and specifically declined valuable federal funds for community development efforts because they knew they could not institute and sufficiently sustain elaborate and ever-changing compliance measures mandated by Title IX and other statutes triggered by Federal financial assistance.

Title IX prohibits discrimination on the basis of sex in connection with "any education program or activity receiving Federal financial assistance . . . ." *Id*. at § 1681. That statute does not define "Federal financial assistance," but the administrative enforcement provisions of Title IX direct each individual federal department and agency to promulgate its own rules and regulations to effectuate the provisions of Title IX with respect to each agency's individual programs.[3]  The relevant regulations[4] define "Federal financial assistance" as follows:

---

[3] *See* 20 U.S.C. § 1682 (empowering agencies that extend grants or other assistance to education programs or activities to promulgate their own rules and regulations under Title IX).

[4] Both the Court in its July 21, 2022 Memorandum Opinion and the leading case on this issue, *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n Illinois, Inc*., 134 F. Supp. 2d 965, 971-72 (N.D. Ill. 2001) cite the Department of Education regulation 34 C.F.R. § 106.2(g) and its definition of "Federal financial assistance."  The Court aptly noted, however, at footnote 9 of that Memorandum Opinion, that this definition pertains only to activities and programs *"authorized or extended under a law administered by [the Department of Education]."* (emphasis added). Tax exemptions under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3), are administered by the Internal Revenue Service ("IRS"), a bureau of the Department of the Treasury. The appropriate authority to look to is thus the Department of Treasury's Title IX regulations.  However, the result is the same.  The definitions in the two regulations, along with those of 21 other agencies, are the same.

(1) A grant or loan of Federal financial assistance, including funds made available for:

(i) The acquisition, construction, renovation, restoration, or repair of a building or facility or any portion thereof; and

(ii) Scholarships, loans, grants, wages, or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.

(2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.

(3) Provision of the services of Federal personnel.

(4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.

(5) Any other contract, agreement, or arrangement that has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

31 C.F.R. § 28.105; 34 C.F.R. § 106.2(g).

Tax exemptions ***are not on this list*** and thus fall outside the definition of Federal financial assistance.[5]   As the Fourth Circuit explained in *Reyes–Gaona v. North Carolina Growers Ass'n*, 250 F.3d 861, 865 (4th Cir. 2001), "the doctrine of expressio unis est exclusio alterius instructs that where a law expressly describes a particular situation to which it shall apply, what was omitted or excluded was intended to be omitted or excluded."

---

[5] While the United States Supreme Court in *Regan v. Tax'n With Representation of Washington*, 461 U.S. 540, 544 (1983) commented that "[a] tax exemption has much the same effect as a cash grant," *Regan* was not a Title IX case – it decided whether the IRS denial of 501(c)(3) status to an entity that was substantially engaged in political lobbying violated the First Amendment.  It did not hold that a tax exemption constituted a "cash grant" for any purpose under federal law.  Moreover, the Court in *Regan* specifically noted in a footnote that "[i]n stating that exemptions and deductions, on one hand, are like cash subsidies, on the other, we of course do not mean to assert that they are in all respects identical."  *Id*. at 544 n.5.

As this Court observed in *Pasco v. Protus IP Sols., Inc.*, 826 F. Supp. 2d 825, 840–41 (D. Md. 2011), "in situations where [a] statute is silent or ambiguous with respect to [a] specific issue, under *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), this Court must afford substantial deference to a federal agency's statutory interpretation." The agency's interpretation of the statute is presumptively valid "so long as it is 'reasonably related to the purposes of the enabling legislation.'" *Mourning v. Fam. Publications Serv., Inc.*, 411 U.S. 356, 369 (1973). Even where "*Chevron* deference is not appropriate," under *United States v. Mead Corp.*, 533 U.S. 218, 234–35 (2001), "the agency's decision is still entitled to respect based on its persuasiveness." *A.T. Massey Coal Co. v. Barnhart*, 381 F. Supp. 2d 469, 484 (D. Md. 2005), *aff'd sub nom. A.T. Massey Coal Co. v. Holland*, 472 F.3d 148 (4th Cir. 2006).

The conduct of the executive branch further confirms this view. To our knowledge, the federal government has never brought an enforcement action against a nonprofit that does not receive federal funds for failing to have a Title IX program.

Even if the federal government intended to extend the requirements of Title IX based on tax exemption alone, under Supreme Court precedent interpreting Congress's spending power, the government is required to do so "unambiguously," and the subject entities must "voluntarily and knowingly" accept those terms. *See Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17 (1981); *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1569 (2022). That has not occurred. As stated above, far from unambiguously extending Title IX based on tax exemption alone, the government has, through agency regulations, confirmed that tax exemption ***is not*** "Federal financial assistance." Moreover, there are requirements that recipients of federal funds receive notice from the federal government of the federal statutes applicable to them (by virtue of their receiving those funds). The IRS issues no such notification regarding tax-exempt status.

For these reasons, this Court should follow the applicable regulations and hold that tax-exempt status does not constitute "Federal financial assistance" under Title IX.

**B.      The Majority of Courts that Have Considered this Issue Have Held that Tax Exemptions Do Not Constitute "Federal Financial Assistance"**

Receipt of "Federal financial assistance" brings an entity under the jurisdiction of a web of federal statutes and regulations.  A number of United States District Courts have considered the question of whether tax-exempt status constitutes "Federal financial assistance" under Title IX, Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq*. ("Title VI"), and/or The Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*. (the "Rehabilitation Act"). A large majority of those Courts have held that tax-exempt status does not constitute "Federal financial assistance."

The leading case on this issue is *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n Illinois, Inc*., 134 F. Supp. 2d 965, 971-72 (N.D. Ill. 2001), which has been cited in the parties' briefs and in the Court's Memorandum Opinion of July 21, 2022.  In that case, the United States District Court for the Northern District of Illinois specifically held that tax-exempt status does not constitute "Federal financial assistance" under Title IX.  *Id*.  The Court relied on the common federal agency definition of "Federal financial assistance" quoted above and the United States Supreme Court's decision in *Department of Transp. v. Paralyzed Veterans of Am*., 477 U.S. 597, 606-07 (1986), in which the Supreme Court held that Title IX applies only to entities that receive federal money, not those that merely benefit economically from federal programs.

The *Johnny's Icehouse* decision represents the majority view of courts on this issue.  *See, e.g., Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 332 (E.D.N.Y. 2012) (holding that tax-exempt status "does not constitute Federal financial assistance within the meaning of Title IX"); *Merrifield v. Beaven/Inter-Am. Companies, Inc*., No. 89 C 8436, 1991 WL 171376, at *3 (N.D. Ill. Aug. 30, 1991) ("The term 'assistance' [under the Rehabilitation Act]

connotes transfer of government funds by way of subsidy, not merely exemption from taxation."); *Martin v. Delaware L. Sch. of Widener Univ.*, 625 F. Supp. 1288, 1302 n.13 (D. Del. 1985), *aff'd*, 884 F.2d 1384 (3d Cir. 1989) ("'Assistance' [under the Rehabilitation Act] connotes the transfer of government funds by way of subsidy, not merely exemption from taxation."); *Bachman v. Am. Soc. of Clinical Pathologists*, 577 F. Supp. 1257, 1265 (D.N.J. 1983) (holding that plaintiff's tax-exempt status did not constitute "Federal financial assistance" for purposes of the Rehabilitation Act); *Stewart v. New York Univ.*, 430 F. Supp. 1305, 1314 (S.D.N.Y. 1976) (holding that various tax deductions and exemptions afforded law school by federal law did not constitute "Federal financial assistance" for purposes of Title VI.).

Other courts, while not directly ruling on the issue, have expressed skepticism that tax-exempt status qualifies as "Federal financial assistance." *See, e.g., Russo v. Diocese of Greensburg*, No. CIV.A09-1169, 2010 WL 3656579, at *3 (W.D. Pa. Sept. 15, 2010) ( "expressing doubt" that tax-exempt status qualified as "Federal financial assistance" for purposes of Title IX and the Rehabilitation Act); *Graham v. Tennessee Secondary Sch. Athletic Ass'n*, No. 1:95-CV-044, 1995 WL 115890, at *17 n.4 (E.D. Tenn. Feb. 20, 1995) (noting that it was not basing its holding that the defendant was subject to Title VI on the association's tax-exempt status qualifying as "Federal financial assistance," because that is a minority view).[6]

---

[6] We are aware of only three judicial opinions, aside from this Court's Memorandum Opinion of July 21, 2022, holding that tax exemptions do constitute "Federal financial assistance" for purposes of Title VI, Title IX, or the Rehabilitation Act. *See E.H. v. Valley Christian Acad.*, No. 221CV07574MEMFGJSX, 2022 WL 2953681, at *7 (C.D. Cal. July 25, 2022); *Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185, 1192–93 (S.D.N.Y. 1988), *aff'd*, 882 F.2d 621 (2d Cir. 1989) (noting, without analysis that the defendant was subject to Title IX because it "receives federal assistance indirectly through its tax exemption and directly through grants from the Department of Energy and EPA"); *McGlotten v. Connally*, 338 F. Supp. 448, 461 (D.D.C. 1972). While the parties and the Court have cited to a footnote in *M.H.D. v. Westminster Sch.*, 172 F.3d 797 (11th Cir. 1999), the Eleventh Circuit in that case did not rule on whether tax exemptions constitute "Federal financial assistance" under any of those statutes.

The Supreme Court cases of *Grove City Coll. v. Bell*, 465 U.S. 555 (1984) and *National Collegiate Athletic Association v. Smith*, 525 U.S. 459 (1999), cited by Plaintiffs and in the Court's July 21, 2022 Memorandum Opinion, do not answer the question before this Court. Both of those cases involved the separate question of whether the defendant was a "recipient" of "Federal financial assistance" (with both opinions concluding that an entity receiving either direct or indirect assistance may still qualify as a "recipient"). *Grove City*, 465 U.S. at 564; *Smith*, 525 U.S. at 468. In contrast, it is undisputed in this case that the Defendant is a "recipient" of a 501(c)(3) tax-exempt designation under federal law—the question is whether a tax exemption is "Federal financial assistance" for purposes of Title IX. As set forth above, it is not. While the "assistance" in both the *Grove City* and *Smith* cases involved an actual cash transfer from the federal government to the defendant, a tax exemption involves no actual receipt of funds from the federal government. For these additional reasons, the Court should follow the majority rule and hold that tax-exempt status does not constitute "Federal financial assistance" under Title IX.

## II.    Consequences of Extending Title IX Based on Tax-Exempt Status Alone[7]

The Department of Education's Title IX regulations and accompanying guidance contain many burdensome requirements, including very elaborate obligations for responding to sexual harassment and other misconduct that could be extended to apply to independent schools should their tax-exempt status qualify as Federal financial assistance. Additionally, because the definition of "Federal financial assistance" in regulations governing awards of federal grants is nearly identical to the definition under Title IX, application of the rule that tax exemption falls within that definition could also trigger a host of restrictions applicable to recipients of federal grants generally. Those grant restrictions limit spending of federal funds to certain types of costs, and if

---

[7] The undersigned thanks the subject matter experts at *Amici Curiae,* Venable LLP, and Saul Ewing Arnstein & Lehr LLP, who assisted with the preparation of this brief.

applied, would be almost impossible for independent schools to comply with.  Lastly, several other federal statutes and their accompanying obligations could likewise be triggered.

### A.    Title IX Compliance Programs

Title IX regulations include a host of ever-changing requirements that could, now or in the future, apply to tax-exempt schools and other nonprofits.  The most complicated aspect of current Title IX compliance is the requirement to have a Title IX coordinator and adopt complex, legalistic grievance procedures for dealing with harassment complaints.  *See* 34 C.F.R. § 106.8(a) (appointment of Title IX coordinator); (c) (requirement of grievance procedures); *see also id.* at § 106.45 (elements of grievance procedure). There are many others, including restrictions on athletics and donations to support a gender-specific cause or program.

As an initial matter, both the substantive and detailed procedural requirements imposed on schools change regularly, and a new presidential administration will often add its own new requirements and obligations.  The Trump Administration issued new regulations, effective August 14, 2020, that significantly changed schools' obligations from the prior administration, and the current Department of Education has in turn issued a notice of its intention to issue yet another new set of regulations, likely within the next year. *See* 87 Fed. Reg. 41390 (July 12, 2022). The Trump-era regulations were accompanied by a nearly 2,000-page Preamble.  The Biden notice of proposed rulemaking was accompanied by a nearly 700-page Preamble.  Schools subject to Title IX must accordingly manage a constantly changing and increasingly intricate set of rules governing compliance.

Current regulations specify in granular detail requirements for investigating and adjudicating sexual harassment complaints. Some of the more detailed requirements are:

- The school must have at least three different staff members to serve as an investigator, a decision-maker for the initial finding, and the decision-maker for the appeal, respectively. *See* 34 C.F.R. §106.45(b)(8)(iii)(B).  Each of those individuals must be trained on and

apply legal principles including, but not limited to, (1) privilege; (2) standards of proof; and (3) the rules of evidence. *See* 34 C.F.R. §106.45(b)(1)(iii). Additionally, they must know the legal definition of harassment and summarily dismiss cases that do not satisfy that definition, while being legally required to adjudicate cases that do satisfy it. *See* 34 C.F.R. §106.45(b)(3).

- The school must employ an elaborate investigation and adjudication process and implement what essentially amount to a prescribed set of rules of civil procedure. The regulations require robust notice requirements (34 C.F.R. § 106.45(b)(2)). The accused and complainant must have the opportunity to present witnesses (including fact and expert witnesses) and other inculpatory and exculpatory evidence, inspect and review evidence, and have others present at proceedings during the adjudication of complaints (34 C.F.R. § 106.45(b)(5)). The investigator must draft a written investigative report (34 C.F.R. § 106.45(b)(5)), and the decision-maker must make a written determination regarding responsibility that includes half a dozen different prescribed subsections, including findings of fact, application of the school's written sexual misconduct policy, and a rationale. 34 C.F.R. § 106.45(b)(7). An appeal must be allowed on one or more of three different prescribed grounds. 34 C.F.R. § 106.45(b)(8). And records of most of the above must be maintained for every complaint for seven years. 34 C.F.R. § 106.45(b)(10).

- While these elaborate proceedings are underway, the school can take no disciplinary action against the accused student unless the school finds that a student is an immediate threat to the physical health and safety of another student (a decision that can, itself, be challenged by the accused). 34 C.F.R. § 106.44 (a) & (c). This means under certain circumstances that a teacher cannot remove a disruptive student from class if he or she has been accused of sexual harassment until the procedures above have been completed, including an appeal.

Many of these directives would be nearly impossible for small or modest sized independent schools to comply with. Twelve percent of the members of the NAIS have an enrollment of fewer than 100 students.[8]  None of the tasks described above can be taken on by a typical teacher or administrator without specialized training and enough available time to draft reports, entertain appeals, and understand and apply legal concepts such as privilege, relevance, legal definitions of sexual harassment, and standards of proof.[9]

---

[8] *See* https://www.nais.org/about/about-nais/

[9] Indeed, because Title IX is not limited to schools but applies to any "Education program or activity," it could conceivably apply to a two- or three-person tax-exempt educational advocacy group, such as a financial literacy or anti-smoking organization. *See* 20 U.S.C. § 1681. How could a two-person organization possibly satisfy the mandates described above?

Universities often have entire divisions dedicated to the investigation and adjudication of Title IX complaints. Johns Hopkins University, for instance, has a dedicated office for responding to Title IX complaints, the Office of Institutional Equity, with a staff of 15, 11 of whom have law degrees and 7 of whom are full time investigators.[10] Independent schools, on the other hand, have long been focused on regulating community health, safety, and conduct issues through the promulgation of policies that are legally compliant, mission-consistent, and tied to deeply held beliefs in the community.  Of note, these policies comply with other applicable discrimination laws that do not require the problematic infrastructure detailed in Title IX.  Rather, they permit independent schools to implement safeguards that are appropriate for their unique identity, culture, and community size and budget.

A requirement to employ individuals with these specialized skills, if applied to a small or even modest sized independent school with stretched finances and personnel, could force such an institution to employ staff in sexual harassment investigations that are undertrained in the specialized legal concepts.  Liability—not for failing to safeguard students and staff, but for failing to meet the intricate standards—would be inevitable.

### B.    Requirements on Federal Grant Recipients

The regulations implementing the Federal Grant and Cooperative Agreement Act of 1977 (31 U.S.C § 6301, et seq.), which authorizes the issuance of federal grants, has a very similar definition of "Federal financial assistance" as Title IX and its regulations. *See* 2 C.F.R.§ 200.1.[11] Those regulations have strict requirements about which costs can be covered by that assistance. For instance, only "Allowable Costs" are permitted to be covered by funds from a federal award, defined as the Federal financial assistance the recipient receives, which do not include state and

---

[10] *See* https://oie.jhu.edu/contact-us/oie-staff/index.html

local taxes. 2 C.F.R.§ 200.405; 200.423; 200.470; 200.1.  Those costs must also be "Reasonable," a definition that requires, among other things, that those costs be consistent with market prices. 2 C.F.R.§ 200.404.

Federal agencies have interpreted these regulations to mean that a federal grant recipient must segregate federal assistance and ensure that the assistance is used only for reasonable and allowed costs.[12]  If a tax exemption were to be deemed "Federal financial assistance," the funds involved would be entity money that the entity would have used to pay its federal taxes but for the exemption.  Because no school segregates such funds, the "federal" funds would be comingled with the rest of the school's funds, and thus none of the school's money could be used for unallowed costs such as state and local taxes.

### C.    Other Laws Triggered by Federal Financial Assistance

Liability under a host of other laws, including those implicated by the Family Education Rights and Privacy Act, the Age Discrimination Act, Section 504 of the Rehabilitation Act, and Title VI, are triggered by receipt of Federal financial assistance, the respective definition of which under those statutes, as noted above, is again very similar to Title IX.  If the definition of Federal financial assistance is extended to include tax exemption, independent schools and other non-profits could find themselves subject to those rules, and many others, overnight as well.

### III.    <u>Need for an Immediate Appeal</u>

Independent schools and other nonprofit organizations are in desperate need of clarity on this issue. Should the Court not reconsider its ruling, an immediate appeal is needed to avoid the severe consequences from uncertainty around the law that now exists.  To this point, the independent school community has relied on the regulations and precedent cited above and has

---

[12] *See. e.g.,* United States Department of Health and Human Services SF-424 Application Guide at 3.

not instituted the substantial, prescriptive measures required to comply with Title IX.  Extending Title IX (and, therefore, a potential host of other federal laws and regulations) to all tax-exempt schools—and, indeed, all tax-exempt entities—regardless of whether they receive federal funds will thus have dire consequences. Proceeding without a clear rule, however, will lead to additional harmful consequences.

Leaving the decision as it stands will give independent schools around the country an impossible choice: 1) take the chance that the old consensus stands and they need not implement the infrastructure required by Title IX and the other statutes; or 2) implement a compliance program required by those statutes, altering the way they protect their students to the detriment of their missions, possibly being forced to increase tuition to cover those costs (and possibly losing students to schools that have elected to take their chances who do not need to raise tuition).  An important decision such as this deserves attention from the Fourth Circuit.

## <u>CONCLUSION</u>

For all of these reasons, *Amici Curiae* respectfully request that the Court grant Defendant's

Motions for Reconsideration or, in the alternative, to Certify Order for Interlocutory Appeal.

August 11, 2022

/s/ Evan T. Shea
Geoffrey R. Garinther, Esq. (Bar No. 4033)
grgarinther@venable.com
Evan T. Shea, Esq. (Bar No. 28677)
etshea@venable.com
William B. King, Esq. (Bar No. 19643)
wbking@venable.com
Venable LLP
750 E. Pratt St., Suite 900
Baltimore, MD 21202
Tel: (410) 244-7400
Fax: (410) 244-7742

J. Douglas Baldridge (Bar No. 11023)
jbaldridge@venable.com
Venable LLP
600 Massachusetts Avenue, NW
Washington, DC 20001