**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**Northern Division**

| | | |
|---|---|---|
| **DONNA BUETTNER-HARTSOE,** *et al.* | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Case No.: 1:20-cv-03132-RDB** |
| **BALTIMORE LUTHERAN HIGH** | * | |
| **SCHOOL ASSOCIATION d/b/a** | | |
| **CONCORDIA PREPARATORY** | * | |
| **SCHOOL,** *et al.* | | |
| | * | |
| **Defendants.** | | |

\* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| **JENNIFER PULLEN** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Case No.: 1:20-cv-03214-RDB** |
| **BALTIMORE LUTHERAN HIGH** | * | |
| **SCHOOL ASSOCIATION d/b/a** | | |
| **CONCORDIA PREPARATORY** | * | |
| **SCHOOL,** *et al.* | | |
| | * | |
| **Defendants.** | | |

\* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| **ANDREA CONRAD,** *et al.* | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Case No.: 1:20-cv-03229-RDB** |
| **BALTIMORE LUTHERAN HIGH** | * | |
| **SCHOOL ASSOCIATION d/b/a** | | |
| **CONCORDIA PREPARATORY** | * | |
| **SCHOOL,** *et al.* | | |
| | * | |
| **Defendants.** | | |

\* \* \* \* \* \* \* \* \* \* \* \*

ARIANNA GOMEZ                          *

      *Plaintiff,*                         *

    **v.**                                      *          **Case No.: 1:20-cv-03267-RDB**

BALTIMORE LUTHERAN HIGH                *
SCHOOL ASSOCIATION d/b/a
CONCORDIA PREPARATORY                  *
SCHOOL, *et al.*
                                                                               *

      *Defendants.*                        *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

SELENA BARBER, *et al.*                *

      *Plaintiffs,*                        *

    **v.**                                      *          **Case No.: 1:21-cv-00691-RDB**

BALTIMORE LUTHERAN HIGH                *
SCHOOL ASSOCIATION d/b/a
CONCORDIA PREPARATORY                  *
SCHOOL, *et al.*
                                                                               *

      *Defendants.*                        *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## REPLY TO PLAINTIFFS' OPPOSITION TO MOTION FOR RECONSIDERATION, OR IN THE ALTERNATIVE, MOTION TO CERTIFY ORDER FOR INTERLOCUTORY APPEAL

Defendant Baltimore Lutheran High School Association d/b/a Concordia Preparatory School ("CPS"), by and through undersigned counsel, hereby submits this Reply to Plaintiffs' Opposition to CPS' Motion seeking this Honorable Court to reconsider the Court's Order of July 21, 2022  and the accompanying Memorandum Opinion,[1] or in the alternative, to amend the Order

---

[1] *See* ECF 57-58 in Case No.: 1:21-cv-00691-RDB; ECF 132-133 in Case No.: 1:20-cv-03267-RDB; ECF 96-97 in Case No.: 1:20-cv-03229-RDB; ECF 80-81 in Case No.: 1:20-cv-03214-RDB; ECF 130-131 in Case No.: 1:20-cv-03132-RDB.

to certify for interlocutory appeal the question of law whether tax exemption under § 501(c)(3) constitutes receipt of federal financial assistance for purposes of Title IX.

## SUMMARY OF REPLY

Just like many of the allegations in the Complaint that have not been borne out in discovery, Plaintiffs' Opposition to CPS' Motion contains material overstatements and inapplicable broad generalizations, and the strength of Plaintiffs' position, or lack thereof, is demonstrated by these efforts to repeat blatantly false, and irrelevant, arguments.

First, on at least seven occasions in their Opposition Plaintiffs argue that "the Supreme Court and our sister circuits have ruled on this exact legal issue" such that it is "well settled" that entities that are tax-exempt under 26 U.S.C. § 501(c)(3) are required to comply with Title IX because tax-exempt status constitutes receipt of federal financial assistance. *See, e.g.,* Pls. Opp. at 14, 15, 23, 36, 37. This is simply false, as the Supreme Court has never reached that conclusion or addressed this issue in any case, let alone the six Supreme Court cases cited by Plaintiffs.

Second, Plaintiffs devote more than five pages of their Opposition, and makes repeated arguments in several sections, that tax-exempt status under § 501(c)(3) is receipt of federal financial assistance for CPS because the school "uses this status as a means to attract and obtain donations and funding, to attach people to its community, and to enhance the experience of its community." *See* Pls. Opp. at 18-23. Plaintiffs, however, cite to no case law from any court trial or appellate level supporting this distinction. Plaintiffs' argument is wholly illogical and irrational given the IRS publication of guidance (which is cited by Plaintiffs) that entities with tax-exempt status under § 501(c)(3) enjoy benefits including tax-deductible contributions. Under Plaintiffs' theory, if a tax-exempt entity wishes to not receive federal financial assistance for purposes of Title IX, the entity must refuse to tell potential donors that contributions are tax-deductible,

although the same guidance is available and published by an agency of the Federal government. This is nonsensical and not supported by any case law or regulatory guidance.

As explained in CPS' Motion, and not addressed in Plaintiffs' Opposition, the critical error in the Court's Order and Memorandum Opinion is that the decision is inconsistent with the whole notion that the scope of Title IX is contractual in nature as reflected in the repeated and recent Supreme Court precedent.  In other words, because responsibility for Title IX is couched as a contractual obligation after receipt of federal financial assistance, it must be clear and unambiguous that an entity has made a voluntary and conscious decision to accept federal financial assistance in exchange for agreeing to comply with anti-discrimination requirements in Title IX. Without that, Title IX cannot apply to CPS.

Moreover, Plaintiffs talk out of both sides of their mouths by arguing that an interlocutory appeal is not warranted because the legal issue is not controlling and there is not substantial grounds for difference of opinion on the legal issue presented (because of the non-existent Supreme Court precedent noted above), while admitting that the Court's decision in these five cases was an "attendant wake-up call . . . to Maryland and middle states private and independent schools."  Plaintiffs cannot have it both ways.  If the Court's decision was a "wake-up call," similar to what Plaintiffs' own expert has stated ("Judge Bennett's ruling on partial summary judgment against CPS will likely soon be sending shockwaves through private K-12 education, and religiously affiliated schools."),[2] it necessarily could not be clear and unambiguous that an entity has made a voluntary and conscious decision to accept federal financial assistance and agree to comply with Title IX by accepting tax exempt status.  This also proves that the legal issue is

---

[2] *See* ECF 59-3 in Case No.: 1:21-cv-00691-RDB; ECF 134-3 in Case No.: 1:20-cv-03267-RDB; ECF 98-3 in Case No.: 1:20-cv-03229-RDB; ECF 82-3 in Case No.: 1:20-cv-03214-RDB; ECF 132-3 in Case No.: 1:20-cv-03132-RDB.

controlling and there is substantial grounds for a difference of opinion warranting this issue to be decided by the Fourth Circuit on an immediate interlocutory basis.

## ARGUMENT

1. **Defendant Is Not Subject To Title IX Because Congress Did Not "Unambiguously" Condition That Defendant's Federal Tax Exemption Constituted The Receipt Of Federal Financial Assistance, Such That Defendant Would "Clearly Understand" And Be "On Notice" That Acceptance Of The Exemption Carried With It An Obligation To Adhere To Title IX.**

Plaintiffs' Opposition fails to address the critical argument in CPS' Motion – the Court's Order and Memorandum Opinion are inconsistent with the whole notion that the scope of Title IX is contractual in nature as reflected in the most recent Supreme Court precedent.

In *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, *reh'g denied*, 142 S. Ct. 2853 (2022), the United States Supreme Court addressed whether emotional distress damages were available in a disability discrimination case brought under Spending Clause statutes the Rehabilitation Act of 1973 and the Patient Protection and Affordable Care Act.  The Supreme Court's decision and more importantly its rationale implicated all four statutes, including Title IX, that prohibit recipients of federal financial assistance from discriminating based upon certain protecting grounds because "the Rehabilitation Act and the Affordable Care Act . . . each expressly incorporates the rights and remedies provided under Title VI."  *Id.* at 1568-69.

The Supreme Court began its analysis by observing that Spending Clause legislation like Title IX operates, "in what amounts essentially to a contract between the Government and the recipient of the funds."  The Supreme Court explained that, "Unlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation operates based on consent: 'in return for federal funds, the [recipients] agree to comply with federally imposed conditions."  *Id.* at 1570 (quoting *Pennhurst State School and Hospital v.*

*Halderman*, 451 U.S. 1, 16 (1981)).  The Supreme Court further explained that, "For that reason, the 'legitimacy of Congress' power' to enact Spending Clause legislation rests not on its sovereign authority to enact binding laws, but on 'whether the [recipient] voluntarily and knowingly accepts the terms of th[at] contract.'" *Cummings*, 142 S. Ct. at 1570 (quoting *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (quoting in turn *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981)).

The Court recognized the obvious proposition that, "Recipients cannot 'knowingly accept' the deal with the Federal Government unless they 'would clearly understand . . . the obligations' that would come along with doing so."  *Cummings*, 142 S. Ct. at 1570 (quoting *Arlington Central Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 296 (2006)).  The Supreme Court noted that it therefore construes "the reach of Spending Clause conditions with an eye toward 'ensuring that the receiving entity of federal funds [had] notice that it will be liable.'" *Cummings*, 142 S. Ct. at 1570 (quoting *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 287 (1998)).

The Court continued by noting that, "when considering whether to accept federal funds, a prospective recipient would surely wonder not only what rules it must follow. . . ." *Cummings*, 142 S. Ct. at 1570.  The Supreme Court expounded that a recipient of federal funding must be "*on notice* that, by accepting federal funding, it exposes itself to liability of that nature." *Id.* (quoting *Barnes*, 536 U.S. at 188 (emphasis in original)). The Court concluded, "Accordingly, if Congress intends to impose a condition on the grant of federal moneys, ***it must do so unambiguously***,'" and only if it had been done unambiguously such that, "we be confident that the recipient 'exercise[d its] choice knowingly, cognizant of the consequences of [its] participation" in the federal program." *Cummings*, 142 S. Ct. at 1570 (quoting *Pennhurst*, 451 U.S. at 17)) (emphasis added).

In *Cummings*, it was undisputed that the defendant received federal financial assistance because it was a rehabilitation center that accepted Medicare.  The Court held that emotional distress damages are not recoverable under Spending Clause statutes because recipients of federal funding would not be on notice of the recoverability of such damages given those damages are not specified in the statute or generally recoverable under contract law.  *Cummings*, 142 S. Ct. at 1570-1576.  Thus, the recovery of emotional distress damages in the Spending Clause statutes was not unambiguously set forth in the law that the defendant knowingly accepted, and it could not be said that the defendant clearly understood that such damages were recoverable.  *Id.*  Of note, when the Supreme Court examined what constituted being unambiguously set forth in the law, it recognized that, "No dive through the treatises, 50-state survey, or speculative drawing of analogies is required." *Id.* at 1573.

However, the clear application of *Cummings* to the instant case is that the current Supreme Court, except for a single Justice, held that for Spending Clause legislation like Title IX to be applicable to any given defendant, its application must be unambiguous under the law, such that the defendant would clearly understand, and knowingly accept, its obligations.  It would be absurd to suggest that a recipient of federal funds did not have notice of available damages, but that the same analysis did not apply to whether an entity was subject to the statute at all.  In other words, the *Cummings* opinion makes clear that for a § 501(c)(3) tax exemption to constitute federal financial assistance for statutes such as Title IX to apply, Congress must have unambiguously conditioned the extension of that tax exemption on the application of Title IX, such that an entity such as CPS in the instant case would "clearly understand" and been "on notice" that its tax exemption was conditioned upon its adherence to Title IX.

In that regard, the *Cummings* opinion make clear that this Court's earlier ruling was dead wrong.  It cannot be credibly argued that it is clear and unambiguous that a § 501(c)(3) entity's tax-exempt status constitutes federal financial assistance to put those entities on notice that they clearly understood and were knowingly accepting the consequences of that status. The statute itself does not define or explain what constitutes federal financial assistance, and the applicable regulations that interpret the statute do not include tax exempt status within the definition of federal financial assistance.[3]  Thus, far from making it unambiguous that tax-exempt status constitutes receipt of federal financial assistance to put a recipient on notice that it is subject to Title IX, the failure to include tax-exempt status in the regulations plainly indicates that tax exemptions do not constitute federal financial assistance.

The United States District Court for the Northern District of Illinois's ruling in *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n*, 134 F. Supp.2d 965, 971-72 (2001), is entirely consistent with the Supreme Court's ruling and contractual analogy in *Cummings*, in that the *Johnny's*

---

[3] The Department of Education's regulations implementing Title IX defining "Federal financial assistance":

(b) Department means the Department of Education.

\* \* \*

(g) Federal financial assistance means any of the following, when authorized or extended under a law administered by the Department:

(1) A grant or loan of Federal financial assistance, including funds made available for:
(i) The acquisition, construction, renovation, restoration, or repair of a building or facility or any portion thereof; and
(ii) Scholarships, loans, grants, wages or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.

(2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.

(3) Provision of the services of Federal personnel.

(4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.

(5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

34 C.F.R. § 106.2(g).  The Department of Treasury's Title IX regulations are identical.  *See* 31 C.F.R. § 28.105.

*Icehouse* court found that only affirmative transfers of money, property, or services constituted federal financial assistance, whereas tax exemptions did not, in part because with Spending Clause legislation the intended recipient knows that it is accepting the affirmative benefit of money, property, or services in exchange for an obligation to adhere to legislation such as Title IX.

Conversely, the contractual analogy set forth in *Cummings* is absent from the handful of cases that represent the minority view that tax-exempt status constitutes federal financial assistance.  The analysis, in dicta, of the issue in *McGlotten v. Connally*, 338 F. Supp. 448 (D.D.C. 1972), which predated *Cummings* by over 50 years, is entirely inconsistent with *Cummings*, and reveals the unreliability of that decision.  Specifically, the *McGlotten* court recognized that the applicable regulations of Title VI did not include tax exemptions in the definition of federal financial assistance. *Id.* at 461. The Court also recognized that there was no discussion in the "massive legislative history" of the 1964 Civil Rights Act to suggest that tax exemptions constituted federal financial assistance. *Id.*  Nevertheless, the Court said that, "[d]istinctions as to the method of distribution of federal funds or their equivalent seem beside the point," and relied on the "plain purpose" of the statute to eliminate discrimination to suggest that tax exemptions constituted federal financial assistance. *Id.* There is no discussion of the contractual analogy and it would be hard to suggest that it was unambiguous that tax exemptions constituted federal financial assistance to put the defendant in that case on notice. Given the *Cummings* decision, and the lack of analysis in *McGlotten*, that case has little or no precedential value.

Similarly, in *E.H. v. Valley Christian Academy*, 2022 U.S. Dist. LEXIS 132893 (C.D. Cal. July 25, 2022), the court, without even acknowledging the regulations, said that there was no controlling precedent and there was no "strong legislative history" that tax-exempt status was not federal financial assistance, and found that "tax-exempt status confers a federal financial benefit

that obligates compliance with Title IX." This holding is entirely inconsistent with *Cummings*, which required unambiguous authority such that the recipient knowingly and voluntarily accepts the obligations of Title IX.

In *Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185, 1192 (S.D.N.Y. 1988), there is no discussion whatsoever of why a tax exemption met the definition of federal financial assistance, and the determination was wholly immaterial and irrelevant given that the defendant in that case received federal grants from the Department of Energy and the Environmental Protection Agency.

In *M.H.D. v. Westminster Schools*, 172 F.3d 797 (11th Cir. 1999), the court did not hold that tax-exempt status constituted federal financial assistance; in dicta, in a footnote, it indicated that the argument "was neither immaterial nor wholly frivolous" such that the Court had subject matter jurisdiction. 172 F.3d at 802, n. 12. To the extent that the *M.H.D.* court recognized that it was not bad faith to argue that tax-exempt status constituted federal financial assistance, there was no discussion or recognition of the contractual analogy in *Cummings*, and the court was only addressing a jurisdictional issue in a preliminary motion unlike the procedural posture here.

Based upon the current Supreme Court analysis in *Cummings*, how could a school like CPS have knowingly and voluntarily agreed to be subject to Title IX by the mere fact of its non-profit status? It could not, and it has had zero notice that it would be liable for the consequences. Non-profit charitable entities predate the modern tax code, which the Supreme Court acknowledged in *Bob Jones University v. United States*, 461 U.S. 574, 588 (1983), when it stated that "Tax exemptions for certain institutions thought beneficial to the social order of the country as a whole, or to a particular community, are deeply rooted in our history, as in that of England" and noted that "special privileges . . . have long been extended to charitable trusts." That, however, does

not mean that an entity that is charitable and promotes the public good, such that it qualifies for §

501(c)(3) tax exemption, has received federal financial assistance.  In *Stewart v. N.Y. Univ.*, 430

F. Supp. 1305, 1314 (S.D.N.Y. 1976), the District Court noted that tax exemption "'creates only a

minimal and remote involvement' by the government in the activities of the recipient," and thus is

not sufficient to support a claim under Title IX.  Unlike an affirmative transfer of money, property

or services, where the recipient can make the decision whether to accept federal funds or services

and the accompanying "strings attached," tax exemption reflects minimal and remote government

involvement such that it cannot reasonably be said that accepting tax exemption amounts to

contractual acceptance of anti-discrimination requirements under statutes such as Title IX.

To that end, the *amici curiae* briefs submitted to the Court are instructive in that they relate

that the Court's Memorandum Opinion and Order "creates grave uncertainty and anxiety for [The

Association of Independent Maryland Schools, Inc.] member schools – 100 of which are in this

state – about their legal obligations" because "Under the Court's decision, schools would abruptly

find themselves subject to the burdens but not the benefits of federal funding."  *See* ECF 134-1 in

Case No. 1:20-cv-03132-RBD at 10.   Additionally, the National Association of Independent

Schools, the National Business Officers Association, the Association of Independent Schools of

Greater Washington, the Southern Association of Independent Schools, the Virginia Association

of Independent Schools, the North Carolina Association of Independent Schools, and the Palmetto

Association of Independent Schools *amici curiae* brief, which was also supported by fifty-four

(54) other nonprofit organizations and represented the vast majority of the private school

community including approximately 30,500 private schools, expressly stated that "[t]he

independent school community has relied on the regulations and precedent cited above and has

not instituted the substantial, prescriptive measures required to comply with Title IX": "For many

years, independent schools throughout the country have relied on federal regulations and a consensus among education lawyers and other professionals that, by foregoing federal funds, they would not be burdened with the requirements of Title IX and a host of other federal statutes that mandate strict and cumbersome regulatory infrastructures." *See* ECF 136-1 in Case No. 1:20-cv-03132-RBD at 2, 4, 13-14. Plaintiffs even acknowledge this when they argue that the Court's Order and Memorandum Opinion were an "attendant wake-up call . . . to Maryland and middle states private and independent schools that tax-exemption may constitute a form of federal financial assistance for purposes of Title IX." *See* Pls. Opp. at 35.

The record is wholly devoid of evidence that it is clear and unambiguous that a § 501(c)(3) entity's tax-exempt status constitutes federal financial assistance to put those entities on notice that they clearly understood and were knowingly accepting the anti-discrimination requirements of Title IX. The Court's conclusion that CPS knowingly and voluntarily agreed to abide by Title IX via its § 501(c)(3) tax-exempt status was patently incorrect and should be reconsidered.

### 2. Plaintiffs' Argument That CPS Has Used Its Tax-Exempt Status As A Tool For Its Own Gain Is Irrelevant.

Plaintiffs also devote numerous pages to refer to CPS newsletters to student families and alumni while arguing that CPS' tax-exempt status under § 501(c)(3) is receipt of federal financial assistance because the school "uses this status as a means to attract and obtain donations and funding, to attract people to its community, and to enhance the experience of its community." *See* Pls. Opp. at 18-23. Plaintiffs, however, cite to no case law from any court, trial or appellate level, supporting this distinction. As discussed above, the question is not how CPS, or any other non-profit charitable entity, uses its § 501(c)(3) tax-exempt status, but whether CPS accepted § 501(c)(3) tax-exempt status knowingly and voluntarily in exchange for compliance with Title IX.

Plaintiffs' argument is also wholly illogical and irrational given the IRS publication of guidance (which is cited by Plaintiffs) that entities with tax-exempt status under § 501(c)(3) enjoy benefits including tax-deductible contributions and reduced postal rates.  Under Plaintiffs' theory, if a tax-exempt entity wishes to not receive federal financial assistance for purposes of Title IX, the entity must refuse to tell potential donors that contributions are tax-deductible although the same guidance is available and published by an agency of the Federal government.  Moreover, under Plaintiffs' theory, a tax-exempt entity must divert funds away from furthering the goals and initiatives of the entity's charitable endeavors and pay full postal rates for mailings through the United States Postal Service.   This is nonsensical and not supported by any case law or regulation.

### 3.   If Reconsideration Is Not Granted, An Immediate Interlocutory Appeal Is Warranted In Light Of The Impact Of The Court's Decision, As Well As Other Decisions On The Title IX Issue.

If reconsideration is not granted, an immediate interlocutory appeal is warranted.  On this issue, there is no dispute as to the applicable standard.  "A district court's order denying a motion for summary judgment or denying a motion to dismiss is interlocutory and may be appealed only . . . if the district court certifies under 28 U.S.C. § 1292(b) that the order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." *Georgetown Coll. v. Madden*, 660 F.2d 91, 96-97 (4th Cir. 1981).  Plaintiffs argue in their Opposition that none of those elements exist.

First, Plaintiffs argue that whether Title IX applies to CPS is not a controlling question of law because it is not a question of pure law because the Court's Memorandum Opinion cited evidence relating to CPS' financial standing.  What Plaintiffs omit, however, is that the evidence was only relevant to establish that CPS is a § 501(c)(3) tax-exempt entity, a factual issue that is

not disputed.  Therefore, the question for immediate interlocutory appeal is "an abstract legal issue that the court of appeals can decide quickly and cleanly." *Int'l Refugee Assistance Project v. Trump*, 404 F. Supp. 3d 946, 950 (D. Md. 2019) (quoting *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340 (4th Cir. 2017) (quoting in turn *Mamani v. Berzain*, 825 F.3d 1304, 1312 (11th Cir. 2016)).

Plaintiffs also argue that whether Title IX applies to CPS based upon its tax-exempt status is not a controlling question of law because it would not impact the proceedings on Plaintiffs' other state-law negligence claims against CPS.  While that is true, Plaintiffs gloss over the accepted principle that a controlling question of law exists when it would, if decided differently, substantially alert the lawsuit.  In other words, to be controlling the question of law does not have to resolve the suit entirely, but includes questions that are dispositive in other respects such as whether a particular claim exists, whether a particular defense is available to defeat a claim, and questions relating to subject matter jurisdiction.  *See* 3 Moore's Manual – Federal Practice and Procedure § 27.04 (2022).  As the Court has held previously, a controlling question of law includes a question "'if interlocutory reversal might save time for the district court, and time and expense for the litigants.'"  *Coal. For Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, No. CCB-06-2773, 2015 U.S. Dist. LEXIS 83741, at *13 (D. Md. June 29, 2015) (quoting 16 Wright et al., Federal Practice & Procedure § 3930).

It cannot be disputed that whether Title IX applies to CPS in these five cases based upon its tax-exempt status (or that the statute only applies to CPS between April 8, 2020 when CPS applied for a PPP loan from the Federal government and received the loan, and November 10, 2020 when the loan was forgiven) is a critical and decisive issue for liability. The question of whether CPS was required to abide by Title IX during all of Plaintiffs' years at the school is of

critical importance to what liability and damages evidence can be presented at trial. It is also of critical importance to private independent schools across the county as demonstrated by the *amici curiae* briefs submitted to the Court.

Second, Plaintiffs argue that there is not a substantial ground for difference of opinion because the issue has been decided by the Supreme Court. This is simply false, as the Supreme Court has never reached that conclusion or addressed this issue in any case, let alone the six Supreme Court cases cited by Plaintiffs. *See Cannon v. University of Chicago*, 441 U.S. 677 (1979) (issue was whether Title IX authorized a private cause of action); *Regan v. Taxation with Representation*, 461 U.S. 520 (1983) (as discussed at length in CPS' Motion, issue was the constitutionality of a provision in § 501(c)(3) pertaining to lobbying organizations); *Grove City Coll. v. Bell*, 465 U.S. 555 (1984) (issue was whether institution was a "recipient" of federal financial assistance as a result of student tuition payments); *Gebser*, 524 U.S. at 274 (issue was standard of actual notice and deliberate indifference under Title IX); *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459 (1999) (issue was whether institution was a "recipient" of federal financial assistance by receiving dues payments from member schools).

None of those cases addressed or considered the issue presented here regarding whether § 501(c)(3) tax exempt status constitutes federal financial assistance, a conclusion that is supported by the fact that the Court's Memorandum Opinion stated on pages 8-9 that "Neither the Supreme Court nor the United States Court of Appeals for the Fourth Circuit have directly addressed whether tax-exempt status under § 501(c)(3) constitutes federal financial assistance for purposes of Title IX." Plaintiffs' repeated argument that the issue presented has been decided by the Supreme Court is blatantly incorrect.

Instead, "[a]n issue presents a substantial ground for difference of opinion if courts, as opposed to parties, disagree on a controlling legal issue." *Lynn v. Monarch Recovery Mgmt.*, 953 F. Supp. 2d 612, 620 (D. Md. 2013) (quoting *Randolph v. ADT Sec. Servs. Inc.*, 2012 U.S. Dist. LEXIS 10469, at *6 (D. Md. January 30, 2012)).

To establish that element, the *Johnny's Icehouse* decision represents the majority view of courts on this issue. *See, e.g., Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 332 (E.D.N.Y. 2012) (holding that tax-exempt status "does not constitute Federal financial assistance within the meaning of Title IX"); *Merrifield v. Beaven/Inter-Am. Companies, Inc.,* No. 89 C 8436, 1991 WL 171376, at *3 (N.D. Ill. Aug. 30, 1991) ("The term 'assistance' [under the Rehabilitation Act] connotes transfer of government funds by way of subsidy, not merely exemption from taxation."); *Martin v. Delaware L. Sch. of Widener Univ.*, 625 F. Supp. 1288, 1302 n.13 (D. Del. 1985), *aff'd*, 884 F.2d 1384 (3d Cir. 1989) ("'Assistance' [under the Rehabilitation Act] connotes the transfer of government funds by way of subsidy, not merely exemption from taxation."); *Bachman v. Am. Soc. of Clinical Pathologists*, 577 F. Supp. 1257, 1265 (D.N.J. 1983) (holding that plaintiff's tax-exempt status did not constitute "Federal financial assistance" for purposes of the Rehabilitation Act); *Stewart v. New York Univ.*, 430 F. Supp. 1305, 1314 (S.D.N.Y. 1976) (holding that various tax deductions and exemptions afforded law school by federal law did not constitute "Federal financial assistance" for purposes of Title VI.).   Other courts, while not directly ruling on the issue, have expressed skepticism that tax-exempt status qualifies as federal financial assistance.  *See, e.g., Russo v. Diocese of Greensburg*, No. CIV.A09-1169, 2010 WL 3656579, at *3 (W.D. Pa. Sept. 15, 2010) ( "expressing doubt" that tax-exempt status qualified as "Federal financial assistance" for purposes of Title IX and the Rehabilitation Act); *Graham v. Tennessee Secondary Sch. Athletic Ass'n*, No. 1:95-CV-044, 1995 WL 115890,

at *17 n.4 (E.D. Tenn. Feb. 20, 1995) (noting that it was not basing its holding that the defendant was subject to Title VI on the association's tax-exempt status qualifying as "Federal financial assistance," because that is a minority view).

Conversely, there are three judicial opinions, aside from the Order and Memorandum Opinion, holding that tax exemptions do constitute federal financial assistance for purposes of a Spending Clause legislation.  *See Valley Christian Acad.*, No. 221CV07574MEMFGJSX, 2022 WL 2953681, at *7; *Fulani*, 684 F. Supp. at 1192–93; *McGlotten*, 338 F. Supp. at 461.[4]  While none of the cases that have actually decided that § 501(c)(3) tax-exempt status requires compliance with Title IX have performed any detailed analysis and consideration of the issue, there are clearly conflicting decisions between judges in courts in various circuits, meaning there is substantial grounds for difference of opinion.

Lastly, Plaintiffs argue that an immediate interlocutory appeal would not materially advance the ultimate termination of the litigation because it would not terminate Plaintiffs' other state-law negligence claims against CPS.   Plaintiffs, however, again give short shrift to the actual applicable legal standard because as the Court has repeatedly held, when "deciding whether certification will materially advance the ultimate termination of the litigation, 'a district court should consider whether an immediate appeal would: (1) eliminate the need for trial, (2) **eliminate complex issues so as to simplify the trial, or** (3) eliminate issues to make discovery easier and less costly.'" *Ekstrom v. Cong. Bank*, Civil Action No. ELH-20-1501, 2021 U.S. Dist. LEXIS 6628, at *8 (D. Md. Jan. 13, 2021) (quoting *Goodman v. Archbishop Curley High School, Inc.*,

---

[4] Plaintiffs also cite to a recent decision in *Doe v. CVS Pharmacy, Inc*., No. 18-cv-01031-EMC, 2022 U.S. Dist. LEXIS 139684, at *20 (N.D. Cal. Aug. 5, 2022), but like the Supreme Court cases noted above, the decision did not involve or address tax-exempt status or federal financial assistance.  In that case, the issue was whether, under the Affordable Care Act, the plaintiff had to prove that CVS Pharmacy, Inc. had received federal financial assistance as a result of its operations, or whether such proof could come by the operations of CVS subsidiaries.

195 F. Supp. 3d 767, 773 (D. Md. 2016) (quoting in turn *Coal. For Equity & Excellence in Md. Higher Educ.*, 2015 U.S. Dist. LEXIS 83741, at *13)) (emphasis added).  While Plaintiffs focus on the first potential reason that an interlocutory appeal would materially advance the ultimate termination of the litigation, Plaintiffs ignore the second upon which CPS' Motion is based.

An immediate interlocutory appeal of the question of law whether tax exemption under § 501(c)(3) constitutes receipt of federal financial assistance for purposes of Title IX may materially advance the ultimate termination of this case because if the Fourth Circuit concludes that the tax exemption is not federal financial assistance, it would eliminate the need for further proceedings relative to Title IX.  The parties would eliminate the complex issues regarding Title IX in four of the five pending cases, and substantially limit the issue in the fifth case (*Conrad*) because of the limited time period during which CPS accepted federal financial assistance while Conrad was a student at the school.  The parties would avoid trial on Title IX issues and all attendant preparation including motion *in limine* practice, drafting of jury instructions and *voir dire* on Title IX, and certain witness preparation

Plaintiffs also ignore Defendant's argument that going into settlement negotiations without knowing the result of the appeal would impair the parties' ability to reach a potential resolution and would protract the litigation because it would require the parties to litigate all five cases through trial and then appeal.  This has been held to be sufficient to establish the third element for an immediate interlocutory appeal, and Plaintiffs did not dispute that it is present.  *See  Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 536 (7th Cir. 2012); *Scott v. Ruston La. Hosp. Co.*, No. 16-0376, 2017 U.S. Dist. LEXIS 56138, at *15-16 (W.D. La. Apr. 12, 2017); *In re Lehman Bros. Holdings Inc.*, 2011 U.S. Dist. LEXIS 124313, at *9 (S.D.N.Y. Oct. 26, 2011); *TEFFT v.*

*A.C. & S., INC.*, No. C80-924M; No. C81-179M; No. C81-533M, 1983 U.S. Dist. LEXIS 17150, at \*11 (W.D. Wash. May 6, 1983).

Moreover, it cannot be lost that this is one of five cases that present the same issue. Therefore, CPS is not seeking an interlocutory appeal to decide a minor issue that affects a single case; this is a significant issue that impacts five pending cases.  It would be far more efficient to know the result of the appeal now and whether Title IX applies to CPS in the five cases based upon their tax exemption status, as opposed to trying five cases over many weeks and then appealing each of the cases to the Fourth Circuit.  Furthermore, as demonstrated by the *amici curiae* briefs, there is a general recognition that the issue should be decided quickly to avoid or shorten what the *amici curiae* briefs describe as "a period of disruptive uncertainty around the law in the nonprofit community," *see* ECF 136-1 in Case No. 1:20-cv-03132-RBD at 3, involving "grave uncertainty and anxiety" for many independent private schools about their legal obligations under Title IX. *See* ECF 134-1 in Case No. 1:20-cv-03132-RBD at 10.  The question presented above for interlocutory appeal meets that standard and is of special consequence to five pending cases, not to mention the many private schools within this jurisdiction and Circuit that are tax-exempt § 501(c)(3) entities.  As the Court's ruling on CPS' Partial Motion to Dismiss or in the Alternative for Summary Judgment represents new law on an issue of first impression in this Circuit, if the Order is not reconsidered, the Court should certify the issue for immediate interlocutory appeal.

WHEREFORE, CPS respectfully requests that the Court reconsider the Order and accompanying Memorandum Opinion, or in the alternative, amend its Order and Memorandum Opinion to state that the Order and Memorandum Opinion involve a controlling question of law regarding whether tax exemption under 26 U.S.C. § 501(c)(3) constitutes receipt of federal financial assistance for purposes of Title IX of the Education Amendments Act of 1972, as to

which there is substantial ground for difference of opinion, and that an immediate appeal from the

Order and Memorandum Opinion may materially advance the ultimate termination of the

litigation.

Respectfully submitted,

/s/Gregg E. Viola
Gregg E. Viola (25737)
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474 (phone)
(410) 752-0611 (fax)
E-mail: viola@ewmd.com
*Attorney for  Defendant*

/s/Mark P. Johnson
Mark P. Johnson (29091)
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474
(410) 752-0611 (fax)
E-mail: johnson@ewmd.com
*Attorney for Defendant*

/s/Eric M. Rigatuso
Eric M. Rigatuso (27605)
ECCLESTON & WOLF, P.C.
Baltimore-Washington Law Center
7240 Parkway Drive, 4th Floor
Hanover, MD 21076-1378
(410) 752-7474 (phone)
(410) 752-0611 (fax)
E-mail: rigatuso@ewmd.com
*Attorney for  Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th of August, 2022, copies of the foregoing were

served via the Court's ECF System to all counsel of record.

/s/Eric M. Rigatuso
Eric M. Rigatuso (Bar # 27605)