IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| Donna Buettner-Hartsoe, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>Baltimore Lutheran High School Association, d/b/a Concordia Preparatory School,<br><br>    Defendant. | Civil Action No. RDB-20-3132 |

### Amicus Brief of The Association of Independent Maryland & DC Schools in Support of Motion to Reconsider or to Certify Order for Interlocutory Appeal

### Identity and Interest of Amicus

The Association of Independent Maryland Schools, Inc. t/a The Association of Independent Maryland & DC Schools ("AIMS") is a vibrant association of 123 independent schools in Maryland and the District of Columbia.[1] Our Maryland members include 100 schools with over 42,000 students and 10,000 employees. Our District of Columbia members include 23 schools, with over 9,000 students and 2,500 employees. AIMS supports its members through professional development programs, accreditation services, and public advocacy.[2]

The Court's July 21 decision sent shockwaves through the independent school community. Whether to seek federal funds is a major decision. Federal money has strings attached. There are complicated and expensive administrative burdens and potential

---

[1] For a listing of AIMS' member schools, see http://www.aimsmddc.org/resource/resmgr/aimsmembership/update_to_aims_school_direct.pdf.

[2] This case is consolidated with four other cases—numbers 20-3214, 20-3229, 20-3267, and 21-0691—for motions and discovery. AIMS intends this brief to support the reconsideration motions pending in each of the consolidated cases.

conflicts with schools' educational philosophies. With Title IX at the center of political controversies, schools receiving federal financial assistance can face whiplash when presidential administrations change. Under the Court's decision, schools would abruptly find themselves subject to the burdens but not the benefits of federal funding.

Although the Court's decision does not set precedent,[3] it creates grave uncertainty that AIMS members can ill afford. Some of our schools have only a few dozen students. They lack the economies of scale that help navigate uncertain legal waters or comply with such a complicated administrative set of procedures.

The Court should not keep its interlocutory decision in place and wait for an appeal from a final judgment. It should grant reconsideration or certify the question for interlocutory appeal.

## Argument

### A. Tax exemption is an acknowledgment of charitable institutions' historical status, not federal financial assistance.

Charities predate modern tax codes. Indeed, several AIMS members predate the Internal Revenue Code. Treating tax-exempt status as federal financial assistance turns history on its head.

When Congress enacted 26 U.S.C. § 501(c)(3) as part of the Tax Reform Act of 1969, it was not creating a new concept. "Tax exemptions for certain institutions thought beneficial to the social order of the country as a whole, or to a particular community, are deeply rooted in our history, as in that of England." *Bob Jones Univ. v. United States*, 461

---

[3] *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011).

U.S. 574, 588 (1983). "The origins of such exemptions lie in the special privileges that have long been extended to charitable trusts." *Id.* When Congress enacted section 501(c)(3), it "was guided by the common law of charitable trusts." *Id.* at 588 n.12. Those same common law principles animated express charitable exemptions in every iteration of the federal tax code. *Id.* at 589–90. Money paid to charities fell outside taxation's purpose—raising money for the public good—because the donations already were for the public good. *Id.*

In Maryland as well, charitable institutions have long enjoyed special exemptions from many taxes and liabilities, owing to their special role in promoting the public good. *See City of Baltimore v. Grand Lodge A.F. & A.M.*, 60 Md. 280, 281 (1883) (tax exemptions); *Perry v. House of Refuge*, 63 Md. 20, 26–27 (1885) (tort immunity).

The IRS, after granting 501(c)(3) status to racially discriminatory schools, changed course in 1970. It announced a policy that racially discriminatory schools were not "charitable" under 26 U.S.C. §§ 170 and 501(c)(3), and were thus ineligible for tax-exempt status. *Bob Jones*, 461 U.S. at 578.

On that point, the Court misread the *Bob Jones* decision. That decision actually cuts against the Court's finding that tax-exempt status is a federal financial assistance under Title VI and IX. In *Bob Jones*, the Supreme Court affirmed the IRS's policy on grounds limited to racial discrimination in education. 461 U.S. at 592. "An unbroken line of cases following *Brown v. Board of Education* establishes beyond doubt this Court's view that racial discrimination in education violates a most fundamental national public policy, as

3

well as rights of individuals," placing a discriminatory school outside the common law definition of "charitable." *Id.*

If 501(c)(3) status were itself federal funding, none of *Bob Jones'* analysis would have been necessary. The Supreme Court simply could have held that every organization that applied for and received 501(c)(3) status voluntarily subjected itself to federal laws tied to the receipt of federal financial assistance.

That same term, however, the Supreme Court held that the federal government's general grant of a particular status, however valuable, is not federal financial assistance. The Rehabilitation Act of 1973, like Title VI, regulated private entities that receive federal financial assistance, and gave enforcement authority to the "agencies administering the federal financial assistance programs." *Cmty. Television of S. California v. Gottfried*, 459 U.S. 498, 509 (1983). The Supreme Court held that the FCC's act of granting broadcast licenses was not such assistance, and therefore the FCC lacked such primary enforcement power. *Id.* Under *Gottfried*, federal licenses and certifications are not federal financial assistance, even when they "provide benefits that are as valuable as direct financial assistance." *Herman v. United Bhd. of Carpenters & Joiners of Am., Loc. Union No. 971*, 60 F.3d 1375, 1381–82 (9th Cir. 1995).

The Supreme Court's decisions in *Bob Jones* and *Gottfried* implicitly rejected Judge Bazelon's finding in *McGlotten v. Connally*, 338 F. Supp. 448, 461 (D.D.C. 1972), that the grant of 501(c)(8) status to a fraternal order was federal financial assistance. The Department of Justice argued in 1985 that *McGlotten* "'has had no case law progeny,'" that *McGlotten's* "discussion of Title VI and 'federal financial assistance' was merely

4

'dictum' in a case that was really about the state action doctrine and the equal protection clause," and that the Supreme Court's decision in *Regan v. Taxation with Representation*, 461 U.S. 540 (1983), "'conspicuously failed to invoke'" the *McGlotten* decision. *Paralyzed Veterans of Am. v. C.A.B.*, 752 F.2d 694, 709 (D.C. Cir. 1985), *rev'd*, 477 U.S. 597 (1986). Although Judge Bazelon took issue with the DOJ's argument, *id.* at 709 & n.107, no decision has endorsed *McGlotten*'s rationale.

In recent decades, the best that any court has said about *McGlotten*'s view of Section 501 tax exemptions is that such an argument is not so "wholly insubstantial and frivolous" as to negate federal question jurisdiction. *M.H.D. v. Westminster Sch.*, 172 F.3d 797, 802 n.12 (11th Cir. 1999); *Barrs v. S. Conf.*, 734 F. Supp. 2d 1229, 1232 (N.D. Ala. 2010). These holdings do not endorse *McGlotten*. They merely recognize that, because no decision has formally overruled *McGlotten*, an attorney may make such an argument without violating Rule 11 or bringing federal question jurisdiction into doubt. The DOJ continues to characterize *McGlotten* as an outlier: ""Typical tax benefits — tax exemptions, tax deductions, and most tax credits — are not considered federal financial assistance."[4]

Finally, even if *McGlotten*'s finding had some continued relevance for 501(c)(8) fraternal organizations, its rationale cannot apply to 501(c)(3) charitable organizations

---

[4] U.S. Dept. of Justice, Civil Rights Div., TITLE VI LEGAL MANUAL § V.C.1.d [p. 8] (updated Feb. 3, 2021) (citing, *inter alia*, *Johnny's Icehouse, Inca v. Amateur Hockey Ass'n of Ill., Inc.*, 134 F. Supp. 2d 965, 971–72 (N.D. Ill. 2001)). *McQuitty* is among only a "few courts" to find otherwise. *Id.* These "few courts" include, other than *McQuitty*, *M.H.D.*, and *Barrs*, only *Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185 (S.D.N.Y. 1988). *Fulani*'s imprecise language is not instructive, because the defendant received money grants from two federal agencies. *Id.* at 1192.

generally or to independent schools in particular. As discussed above, charitable institutions have a special place in the English common law tradition, United States history, and Maryland history. Congress intended for Section 501(c)(3) to reflect these traditions, not to reconceptualize them as a legislative grant of federal financial assistance.

Requiring independent schools to comply with Title IX, as well as a wide range of other federal regulations, simply because they are 501(c)(3) organizations, would interfere with parents' long-recognized Fifth Amendment due process rights. Nearly a century ago, a unanimous Supreme Court held that states could not compel students to attend public school rather than private school, which unreasonably interfered with the "liberty of parents and guardians to direct the upbringing and education of [their] children." *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925). "The child is not the mere creature of the state; those who nurture [children] and direct [their] destiny have the right, coupled with the high duty, to recognize and prepare [them] for additional obligations." *Id.* at 535. These same principles prevent the federal government, under the Fifth Amendment, from unwarranted intrusions on private schools' autonomy. *Farrington v. Tokushige*, 273 U.S. 284, 298 (1927). As discussed in the next section, there is no compelling reason to follow Title IX's particular procedures and accompanying burdens, which threaten the independence of AIMS' member schools and overwhelm lean administrations with complicated and expensive procedures and protocols.

### B. The Court should reconsider its decision, rather than waiting for an appeal from final judgment.

So long as the Court's July 21 opinion remains in place, AIMS' member schools face potentially costly uncertainty. For background, AIMS' member schools are independent, not-for-profit, 501(c)(3) corporations, each governed by an independent, volunteer board of trustees. Each school has published and enacted non-discrimination policies in accordance with state and federal law. Each school seeks a socioeconomically diverse student body and awards financial aid based on financial need.

All AIMS member schools embrace a cyclical, recurring, and rigorous accreditation protocol, overseen by AIMS and endorsed by the International Council Advancing Independent School Accreditation. The standards and criteria for accreditation include requirements for robust and well-developed protocols for supporting student mental and physical health and well-being and for prevention and investigation of sexual harassment of students or employees—with clear evidence that those protocols are in use.

As part of their accreditation, AIMS schools must have policies and procedures to address issues of child sexual abuse and misconduct, sexual harassment, sexual assault and dating violence in our schools. AIMS schools seek at their core to keep all enrolled students—and all employees—physically and emotionally safe in school. Individual schools design their protocols and procedures, and their investigative and disciplinary policies, to align with their mission, their educational philosophy, their religious tradition, if applicable, and the involved students' developmental capacities. These

policies and procedures are integral to each school's educational program and unique culture.

Complying with Title IX requirements would threaten our schools' ability to determine how best to respond to misconduct, and would dictate the content and method for implementing these policies in our independent schools. All schools would be compelled to set up standardized and complicated grievance procedures that would represent a major intrusion into how our schools currently carry out such responses and would effectively turn them into mini-court hearings. It would require our schools' proceedings to become confrontational and litigious, rather than allowing for a range of approaches, including a restorative justice or counselling approach, consistent with each school's culture.

We recognize the importance of addressing the public policies underlying Title IX, but there is no compelling need to constrain and burden independent schools by binding them to Title IX's strictures. Our schools' accrediting bodies already require adherence to high standards for prevention and investigation of discrimination (including discrimination based on sex) and for student safety and well-being. Schools risk losing accreditation if such standards are not met. Accrediting bodies engage all aspects of a school's program and operation, including issues of child sexual abuse, sexual harassment, sexual misconduct and assault, and dating violence. Our schools have existing policies that are working.

Each independent school has its own institutional ethos and unique culture. That ethos and culture is a major part of what makes each independent school distinctive and

what allows each school to have a powerful community effect on its students and employees. A school's ethos shapes—and is shaped by—how it responds to conflict, dishonesty, rule-breaking, and any action or behavior that harms individuals or the community. Education is more powerful when it is steeped in community norms and community procedures that are consistent, predictable, humane, and well-understood. This dynamic is part of what makes independent schools so effective.

Further, community norms, expectations, and protocols need to be appropriate for the children's developmental stage. What is appropriate in first grade may not be appropriate for fifth grade or twelfth grade. Our independent schools serve a range of students, from nursery school at one end of the continuum to high school seniors at the other.

Our schools represent a range of sizes, resources, tuition levels, financial aid capabilities, and staffing and administrative capacities. For many of schools, adding administrative complexity—including appointing and training a Title IX administrative officer and conducting mini-hearings and full-scale investigations—would present a significant financial and logistical hardship and could mean increasing tuition or choosing to let go another administrator who is integral to the program and the school's ethos.

Title IX's administrative burdens would be enormous, inevitably drawing school administrators from the direct work of spending time with faculty and students on specific programs and concerns. Further, Title IX requirements would place an undue

9

burden on a school's budget drawing funds away from educational programming, counseling, and other support services.

Making these burdens worse, the Title IX landscape is subject to sudden shifts. For example, the Department of Education announced this summer that is reinstating guidance and policies that it rescinded just two years ago.[5] Compliance with Title IX would require constant monitoring of rapidly changing policies and standards and would intertwine our member schools' policies with deeply polarized national debates over the best ways to address sensitive issues.

The Court's July 21 decision creates grave uncertainty and anxiety for our member schools—100 of which are in this state—about their legal obligations. Neither the federal Executive nor Congress has ever sought to hold schools to Title IX based on mere 501(c)(3) status, and most federal courts to consider this issue have correctly concluded that tax-exempt status does not, by itself, subject independent schools to Title IX's extensive regulatory requirements. Reconsideration is thus appropriate.

---

[5] *See, e.g.*, Dustin Jones, *Biden's Title IX Reforms Would Roll Back Trump-Era Rules, Expand Victim Protections*, NPR June 23, 2022, https://www.npr.org/-2022/06/23/1107045291/title-ix-9-biden-expand-victim-protections-discrimination.

## Conclusion

AIMS urges the Court to reconsider its July 21 order and hold that 501(c)(3) status is not federal financial assistance under Title IX. Alternatively, the Court should certify the question for interlocutory appeal.

Respectfully submitted:

/s/ *Geoffrey H. Genth*
James P. Ulwick, Bar No. 00536
Geoffrey H. Genth, Bar No. 08735
Steven M. Klepper, Bar No. 26664
Kramon & Graham, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202
(410) 752-6030
julwick@kg-law.com
ggenth@kg-law.com
sklepper@kg-law.com

Counsel for The Association of Independent Maryland Schools, Inc. t/a The Association of Independent Maryland & DC Schools